THE PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, SECOND DISTRICT, Appellant, v. THE NEW YORK CENTRAL RAILROAD COMPANY, Respondent.

Third Department, November 10, 1920.

Railroads — release of intrastate railroad from Federal control — Federal Transportation Act of 1920, section 208, subdivision a, construed — power of Public Service Commission to require intrastate railroad to reduce fares to limit prescribed by charter — constitutional law — limits of Federal power discussed.

Subdivision a of section 208 of the Federal Transportation Act of 1920, which in substance provides that all rates, fares and charges of railroads which are in effect February 29, 1920, on the lines of carriers subject to the Interstate Commerce Act, " shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law," does not attempt to deal with intrastate commerce or with rates of fare within the limits of individual States, except for a limited period within the actual duration of the technical war, and hence since, by said Federal Transportation Act, the New York Central railroad which had been taken over by the United States was released from government control and its property returned to its owners, the duties and obligations of said railroad within the confines of this State are governed by the charter granted to it by this State, and hence the Public Service Commission has power to compel said railroad company to reduce its passenger rates to two cents per mile, which is the maximum limit prescribed in its charter, and this notwithstanding the fact that it was authorized by the Federal government while under Federal control to charge in excess of said rates.

Limits of Federal power over intrastate railroads analysed and discussed per WOODWARD, J.

JOHN M. KELLOGG, P. J., and H. T. KELLOGG, J., dissent, with opinion.

APPEAL by the plaintiff, The Public Service Commission of the State of New York, Second District, from an order of the Supreme Court, made at the Albany Special Term and entered in the office of the clerk of the county of Albany on the 5th day of August, 1920, denying its petition under section 57 of the Public Service Commissions Law and dismissing the proceeding upon the merits.

*Ledyard P. Hale, Counsel to Public Service Commission, Second District,* and *Joseph A. Kellogg; Charles D. Newton, Attorney-General [Edward G. Griffin, Deputy Attorney-General,* of counsel], for the appellant.

*Alexander S. Lyman, Charles C. Paulding* and *William L. Visscher,* for the respondent.

WOODWARD, J.:

The Public Service Commission, Second District (hereafter referred to as the Commission), instituted a proceeding under the provisions of section 57 of the Public Service Commissions Law, the object of which was to compel the New York Central Railroad Company, the respondent, to obey the provisions of an order issued by the Commission directing the respondent to restore the passenger rates prescribed by law on and after the 1st day of September, 1920. This order was issued on the 15th day of June, 1920, and, as a defense, the respondent asserted the provisions of section 208, subdivision a, of the Federal Transportation Act of 1920, and the learned court at Special Term has dismissed the proceeding on the merits, holding in effect that the provisions of the Federal statute operate to fix the rate at three cents per mile until the Legislature of this State has, under the supposed authority of the Federal statute, taken affirmative action changing such rate. (See 112 Misc. Rep. 617.) The question presented for review here is the proper construction of the statute, and, if the construction put upon it by the respondent and the court below is sustained, whether such statute is warranted under the provisions of the Tenth Amendment of the Constitution of the United States.

Adopting the respondent's statement of facts, " various connecting railroads between Albany and Buffalo were con-

solidated into the New York Central Railroad Company, pursuant to chapter 76 of the Laws of 1853, section 7 whereof limited way passenger fares on the road of the consolidated company to a rate not exceeding two cents per mile. November 1, 1869, the New York Central Railroad Company was consolidated into and became a new corporation under the name of the New York Central and Hudson River Railroad Company.   December 23, 1914, the consolidation of the New York Central and Hudson River Railroad Company with other railroad companies resulted in the organization of respondent under the laws of, and operating within the States of New York, Pennsylvania, Ohio, Indiana, Illinois and Michigan, with leased lines operated in the States of New Jersey and Massachusetts and branches extending into Canada.

" The two-cent rate prescribed by section 7 of chapter 76 of the Laws of 1853, in time codified in subd. 5 of section 57 of the Railroad Law, had remained continuously in effect when, on December 28, 1917, the President of the United States, pursuant to Act of Congress, approved August 29, 1916, by proclamation dated December 26, 1917, assumed possession, use, occupation and control of respondent's railroad system." (See 39 U. S. Stat. at Large, 604, chap. 417, amdg. 24 id. 380, § 6, as amd. by 34 id. 587, § 2; Official U. S. Bulletin, Dec. 27, 1917, vol. 1, No. 193, pp. 1, 2.)

Under the provisions of the Federal Control Act of March 21, 1918, it was provided that the railroads so taken over by the general government should continue in that relation " during the period of the war and for a reasonable time thereafter, which shall not exceed one year and nine months next following the date of the proclamation by the President of the exchange of ratifications of the treaty of peace," and the President was authorized to relinquish such control at any time in his discretion. (40 U. S. Stat. at Large, 458, § 14.) By General Order 28, dated May 25, 1918, the Director-General of Railroads authorized the collection from June 10, 1918, of three-cent fares for both interstate and intrastate passenger traffic (Official U. S. Bulletin, May 28, 1918, vol. 2, No. 321, pp. 6, 7), and this rate continued to be authorized and collected up to and including the 29th day of February, 1920, the day following the approval of the Federal Transportation Act of 1920,

· 618   PUBLIC SERVICE COMMISSION *v.* N. Y. CENTRAL R. R. Co.

Third Department, November, 1920.        [Vol. 193.

which provided, in section 208, subdivision a, that " all rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part of the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the Commission " (41 U. S. Stat. at Large, 464, § 208, subd. a), and the court below has held that this prevents the operation of the laws of the State of New York without further action on the part of the Legislature. We are now to determine whether this is the true construction of the provision quoted.

There is a canon of construction which cogently argues that a rational, sensible and practical construction of a constitution, statute or contract should be preferred to one which is unreasonable, absurd or impracticable (*McPhee & McGinnity Co.* v. *Union Pacific R. Co.*, 158 Fed. Rep. 5, 17), and it is always proper to assume that the legislative body has acted with a knowledge of existing laws and constitutions, and that it has intended to produce a harmonious and workable system, without doing violence to constitutional principles. " The Constitution itself," says Cooley in his Principles of Constitutional Law (p. 33), " never yields to treaty or enactment; it neither changes with time, nor does it in theory bend to the force of circumstances. It may be amended according to its own permission; but while it stands it is ' a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances,' " and it is proper, therefore, that we consider the position in which the United States government stood in relation to the respondent's railroad and to the State of New York in the enactment of the provision here under consideration.

There is no doubt that " the government within the Con-

stitution has all the powers granted to it which are necessary to preserve its existence " (*Ex parte Milligan,* 4 Wall. 2, 121) and the United States is sovereign in respect to those matters which have been delegated to it.   " In American constitutional law," says Cooley (p. 21), "a peculiar system is established; the powers of sovereignty being classified, and some of them apportioned to the government of the United States for its exercise, while others are left with the States.   Under this apportionment the nation is possessed of supreme, absolute and uncontrollable power in respect to certain subjects throughout all the States, while the States have the like unqualified power, within their respective limits, in respect to other subjects." (*Thurlow* v. *Massachusetts,* 5 How. [U. S.] 504, 588; *Ableman* v. *Booth,* 21 id. 506, 516; *United States* v. *Cruikshank,* 92 U. S. 542; *Barbier* v. *Connolly,* 113 id. 27; *Mugler* v. *Kansas,* 123 id. 623; *Kidd* v. *Pearson,* 128 id. 1; *Atlantic Coast Line* v. *Goldsboro,* 232 id. 548, 558.)   In other words, in the exercise of the sovereign powers of the United States there are no State lines. (*Lake Shore & Michigan Southern Railway* v. *Ohio,* 173 U. S. 285, 305; *Oklahoma* v. *Kansas Natural Gas Co.,* 221 id. 229, 255.)   It is the same as though there were one great State with a single legislative power, as in Great Britain. But like all other powers granted to Congress by the United States Constitution (Art. 1, § 8), the power to regulate commerce is subject to all the limitations imposed by such instrument, including the Fifth and Tenth Amendments.   Congress has supreme control over the regulation of interstate and foreign commerce, and with the Indian tribes, but if, in the exercise of that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by the Fifth Amendment, and can take only on payment of just compensation.   The power to regulate commerce is not given in any broader terms than that to establish post offices and post roads; but if Congress wishes to take private property upon which to build a post office it must either agree upon the price with the owner or in condemnation pay just compensation therefor.   And if that property be improved under authority of a charter granted by the State, with a franchise to take tolls for the use of the improvement, in order to determine the just compensation such franchise must be taken into con-

**620** PUBLIC SERVICE COMMISSION *v.* N. Y. CENTRAL R. R. CO.

Third Department, November, 1920. [Vol. 193.

sideration. (*Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336, 337.) So, in the exercise of the war power the Congress has plenary power, but it must be used subject to the limitations of the United States Constitution; it can take the property of individuals and corporations only upon the payment of just compensation, and as the States have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience and prosperity of their people, embracing the construction of roads, canals and bridges and the establishment of ferries (*Lake Shore & Michigan Southern Railway* v. *Ohio*, 173 U. S. 285, 294), it must follow that the war power does not include the power to legislate in reference to any of these matters which belong of right to the States; for whatever is not conferred is withheld, and belongs to the several States or to the people thereof. (*Calder* v. *Bull*, 3 Dall. 386; *Gibbons* v. *Ogden*, 9 Wheat. 1, 187; *Briscoe* v. *Bank of Commonwealth of Kentucky*, 11 Pet. 257; *Slaughter House Cases*, 16 Wall. 36; *United States* v. *Cruikshank*, 92 U. S. 542, 550.)

If we are right in these several propositions, the war power does not in its exercise increase the sovereign powers of the United States beyond the enumerated powers; it does not authorize an invasion of the field of State legislation. Though limited in its powers it is supreme in the matters confided to it, and its laws, when made in pursuance of the United States Constitution, form the supreme law of the land, " anything in the Constitution or laws of any State, to the contrary notwithstanding." (*Second Employers' Liability Cases*, 223 U. S. 1, 54.) The law which authorized the President of the United States to take over the railroads of the country was clearly an exercise of the war power; the right to take the property of individuals and corporations upon the payment of just compensation for the purposes of the war, and as the taking did not contemplate their destruction but rather a usufructuary right, to terminate with the ending of the war, there was no occasion for any interference with the legislative power of the State. The government of the United States came into possession of the property under a paramount power — a power superior to that of the State and the owners combined. It had within itself, for the purposes of the war, the combined rights of both

in this public utility. It had the right and the power to legislate in respect to this usufructuary use of the property; to determine the uses to which it should be put and the amount of the compensation which should be paid for such services as were rendered to the public as an incident to the purposes for which it was taken. The New York Central Railroad Company, as a corporate entity created and endowed by the State of New York, owed the duty of service to the State from which these privileges proceeded (*Pennsylvania Gas Co.* v. *Public Service Commission*, 225 N. Y. 397, 409), but when the United States government, in the exercise of its sovereign powers, took possession of the property and the franchises the corporation was absolved from the discharge of these duties, and it had no control over the rates or the service. In short, the New York Central Railroad Company, during the period of the war, was not a commercial railroad exercising its franchises, but a mere instrumentality of the United States in carrying on the war, in the same sense that a steamship or a man-of-war, carrying troops or performing other service, would be an instrumentality for prosecuting the hostilities. The United States has no power under the United States Constitution to construct and operate a railroad in the State of New York for the purpose of discharging the obligations of a common carrier within the confines of the State; it could only do this under its war power, and for war purposes, though as an incident it could undoubtedly carry goods and passengers, but its powers in the premises are due wholly to the war power and not to any authority under the United States Constitution to become a common carrier. These powers ended with the necessity which brought them into operation; the rates of fare which the Director-General established as the condition upon which the United States would transport persons in connection with the war activities had no relation whatever to the New York Central Railroad Company as a New York public service corporation; they were the rates common to the railroad system generally, without any reference to the duties and obligations of these public highways to the States and the people as common carriers.

This was the true environment in which the legislation here under consideration was enacted. The necessity which

justified the taking over of the railroads as war instrumentalities was at an end; the purpose was to restore them to their owners.   The question of just compensation was involved in the method of restoring as well as in taking; the old individual systems, with their affiliations, had been broken up, their organizations dissipated, their traffic diverted.   To simply turn them back without regulations or provision for a continuation of revenues during the period of reorganization would be an act of great injustice; and if we read section 208, subdivision a, of the Federal Transportation Act of 1920 in the light of these conditions, and with a knowledge that the war power did not involve any power to deal with the corporate rights and duties owing to the States of their creation, we shall have little difficulty in arriving at the conclusion that it was not the purpose of Congress to change the corporate rights and duties of the New York Central Railroad Company in so far as it related to the carrying of passengers within the limits of the State of New York, apart from interstate traffic.   The United States government clearly had no power to create the New York Central Railroad Company, nor to endow it with the right of eminent domain.   " The franchises of a railroad corporation," says Nellis on Street Surface Railroads (Vol. 1 [1st ed.], p. 55), " are rights or privileges which are essential to the operation of the corporation, and without which its road and works would be of little value; such as the franchises to run cars, to take tolls, to appropriate earth and gravel for the bed of its road, or water for its engines, and the like.   They are positive rights or privileges, without the possession of which the road of the company could not be successfully worked," and these franchises proceed mediately or immediately from the State.   (*New Orleans Gas Co.* v. *Louisiana Light Co.* 115 U. S. 650, 659, and authorities there cited; *City of New York* v. *Bryan,* 196 N. Y. 158, 165.)   It is an elementary definition of a franchise that it is a grant from the sovereign power (*City of New York* v. *Bryan, supra*), and the sovereign power to create corporations for intrastate purposes at least has not been delegated to the National government, and as the war power begins and ends with the necessities created by war, and does not extend to the creation or regulation of common carriers, it must follow that the Congress could not

be deemed to have intended to go beyond its constitutional powers in the absence of controlling language to that effect. Congress has no power to amend State legislation; its enactments merely supersede or control those of the States where they are in conflict (*Second Employers' Liability Cases*, 223 U. S. 1, 54), and legislation enacted under the war power only goes to the necessities of the war, and not to the internal affairs of the several States in times of peace. Section 208, subdivision a, of the Federal Transportation Act does not, by any fair construction of its language, attempt to deal with intrastate commerce, or with the rates of fare within the limits of individual States, except for a limited period within the actual duration of the technical war. Its language is that " all rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law," etc. What do we understand by " pursuant to authority of law? " Law, as we understand it, is a rule of civil conduct prescribed by the law-making power in the State (18 Am. & Eng. Ency. of Law [2d ed.], 569), and it must be an existing rule of conduct; a rule prescribed. When the Congress declared that the then existing rates should " continue in force and effect " until thereafter changed " pursuant to authority of law," it could not have intended a law to be thereafter enacted, for it had already provided for a change " by State or Federal authority," which, we assume, contemplated legislation where the law did not already provide the necessary rule. In the case of the New York Central Railroad Company the rate of two cents per mile was a charter provision; it was the condition which the corporation accepted along with its franchises. It is as much a part of its being as any other provision in its charter which must be accepted or rejected *in toto*. If accepted it must be taken as offered, and the company has no right to accept in part and reject in part. (*Paige* v. *Schenectady R. Co.*, 178 N. Y. 102, 114.) The acceptance of the charter by the corporation constituted

**624** Public Service Commission *v.* N. Y. Central R. R. Co.

Third Department, November, 1920.          [Vol. 193.

a contract with the State of New York, and any action which relieves the grantees of the burdens it imposes is in violation of the contract with the State, and is void as against public policy. (*Paige* v. *Schenectady R. Co., supra,* 115, and authorities there cited.) The Federal Transportation Act of 1920 repealed, in effect, the act under which the railroads were taken over by the United States, or at least released the respondent from any operation of that law, and there can be no reasonable doubt that, as the chartered rights of the New York Central Railroad Company came into full operation with the return of the railroad property to its owners, the duties and obligations, constituting a part of the charter contract, followed the rights and are now controlling. The Federal Transportation Act of 1920 does not purport to sever the relation between the charter privileges and the condition upon which those rights were granted; no such power was delegated to Congress and no such power has been attempted to be exercised. The act of Congress simply suspended the operation of existing State law up to the 1st day of September, 1920, and then, by operation of law — by the force of the contract with the State of New York — the rates established in 1853 became operative, and the duty devolved upon the Public Service Commission of the Second District to compel obedience to the law.

The order appealed from should be reversed, with costs, and the Commission should have judgment in accord with the petition, with costs.

All concur, Cochrane, J., in result, except John M. Kellogg, P. J., who dissents, with an opinion in which H. T. Kellogg, J., concurs.

John M. Kellogg, P. J. (dissenting):

The taking over of the railroads by the government during the war was a proper war measure and in effect superseded and annulled, for the time being at least, the State laws with respect to their operation. There can be no serious dispute but that the Federal Transportation Act of 1920 (41 U. S. Stat. at Large, 456, chap. 91), under which the railroads were returned to the owners, contemplated that the rates

which the government had established upon the roads should not be reduced prior to September 1, 1920, by any State authority and that existing rates should continue until .they were thereafter changed by State or Federal authority, respectively, or pursuant to authority of law.   Evidently the words " pursuant to authority of law ." were intended to be qualified by the preceding word " thereafter."  (See 41 U. S. Stat. at Large, 464, § 208, subd. a.)   The public records, the terms of the act itself and the situation existing and the general understanding in and outside of Congress, make it clear that such was the legislative intent.   The Transportation Act recognized that by taking over and operating the roads the government had in effect demoralized them and their service and rendered it impracticable for their owners to operate them unless they had some government relief or assistance, and this act was intended to have that effect. The act, however, permitted the States and the local boards to decrease the rates thereafter, but apparently upon the ground that they were excessive.   Assuming, therefore, that Congress intended that rates should not be changed by any law or regulation in the State unless the law or regulation was thereafter made, the case turns upon the question of the legality of the Transportation Act.

The war measure by which the government took over the railroads was not complete by the taking; it involved the operation and the return, both of which were contemplated by and were a necessary part of it.   " Assuming that the implied power to enact such a prohibition must depend not upon the existence of a technical state of war, terminable only with the ratification of a treaty of peace or a proclamation of peace ( *United States* v. *Anderson,* 9 Wall. 56, 70;  *The Protector,* 12 Wall. 700, 702; *Hijo* v. *United States,* 194 U. S. 315, 323), but upon some actual emergency or necessity arising out of the war or incident to it, still, as was said in *Stewart* v. *Kahn* (11 Wall. 493, 507):  ' The power is not limited to victories in the field and the dispersion of the [insurgent] forces.   It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress.' "  ( *Hamilton*

*v. Kentucky Distilleries Co.,* 251 U. S. 146, 161.   See *Ruppert v. Caffey,* Id. 264, 282.)

Immediately upon taking over the railroads the government, in effect, operated the entire systems of railways in the country as one system, taking from certain lines the business which had been built up by them in the previous years and diverting it to other lines as the interests of the government required. It had greatly increased the wages of railway employees and, as a consequence of the war, all expenses of railroads as well as of others, were nearly doubled.   It was obvious, and the legislative records show that it was deemed disastrous to the roads and injurious to the public and the general good if they were to be returned to the owners without some relief from the conditions which the government had caused by its control and management — that unless relief was granted bankruptcy of many and perhaps of most of the roads would have followed.

Congress evidently considered that the rates in the various States fixed by the Commission and the statutes before government control were then of doubtful validity because of the changed condition.   It evidently considered that a rate which was just before the war was unjust and unremunerative at the time the Transportation Law was passed.   It had good reason to conclude that a return of the roads without some governmental protection meant chaos, and that there were no existing rates outside of those fixed under government control. It evidently had in view the rule laid down in *Municipal Gas Co.* v. *Public Service Commission* (225 N. Y. 89, 96), from which we quote: "Into every statute of this kind, we are to read, therefore, an implied condition.   The condition is that the rates shall remain in force at such times and at such only as their enforcement will not work denial of the right to a fair return.   When the return falls below that level, the regulation is suspended.   When the level is again attained, the duty of obedience revives.   There would be no obscurity about this if the condition were expressed.   It is no less binding because it is implied.   The Constitution is the supreme law;  and statutes are written and enforced in submission to its commands."

The Transportation Act did not entirely return the roads

to the owners and release the grip which the Federal government had upon them as a war measure.   As we have seen, it provided, in effect, that the existing rates should continue until thereafter changed by it or the local authorities.   It had a direct interest in further control.   It warranted for six months the net earnings of all roads so desiring, reserving to itself the surplus if any.   It retained supervision over the securities to be issued, and promised, in effect, financial assistance for the period of two years.   By its terms, if upon the rates established by, or to be established under it, a carrier received a net railway operating income exceeding six per cent upon the value of the property used in the service, the excess of such income was controlled by the government.   Evidently the rate of wages fixed by the Federal Railroad Administration cannot be changed by the companies at will, but by the terms of this law are intended to be controlled by the Federal government.   If the New York Central Railroad Company becomes bankrupt, it not only interferes with intrastate business of the road but is also destructive of its interstate business.   The same is true of every road.   The provisions of this act were evidently intended to prevent bankruptcy of the various roads and to retain them for the purpose of interstate commerce and for carrying the mails and general public use.   If the government substantially takes the control of wages into its hands, it is not unreasonable for it to take the control of rates, and by the act in question it has substantially done both.   By the provisions under which the railroads were taken by the government, its good faith was pledged to maintain the condition of the roads and to return them to the owners in their integrity, unimpaired by the government use.   As we have seen, the act of taking over the railroads as a war measure continues until they are returned.   They are returned in a qualified sense and in a sense the Federal government keeps control of them.   The extraordinary war powers and duties of the Federal government are not met until the evils arising from its forcible seizure and use have been remedied.   They are returned only when they come back to their normal condition as going concerns and able to go.   A thriving manufacturing plant, taken from an owner, is not restored to him by delivering to him its ruins.   The legislation in question, so far as possible,

has attempted to return the properties in such a way that the owners may use them and the people benefit by them. The Federal government, which has a clear right to control interstate commerce, is a judge, in a way, of what acts are necessary for such control, and it may prevent the States from destroying the instruments by which interstate commerce is to be carried on. It may prevent the establishment of rates prejudicial to or destructive of interstate commerce. (*Houston & Texas Ry.* v. *United States*, 234 U. S. 342, 351, 352.) As a part of and to complete necessary war legislation and in the interest of interstate commerce I am satisfied the act is valid. I, therefore, favor affirmance.

H. T. Kellogg, J., concurs.

Order reversed, with costs. Judgment for the Commission in accordance with the petition, with costs.