OPINION OF THE COURT
Brian Hansbury, J.
Plaintiff has commenced this small claims action to recover damages resulting from the alleged wrongful exhumation and cremation of Dodo, a mixed breed dog who emigrated with plaintiff from China to the United States. Defendant has counterclaimed for damages resulting from plaintiffs alleged breach of an agreement to pay annual fees for the maintenance of Dodo’s burial plot and general upkeep of the pet cemetery. Having weighed the evidence adduced at trial, and having had ample opportunity to observe the demeanor and assess the credibility of the witnesses, the court makes the following findings of fact and conclusions of law.
Findings of Fact
On January 5, 2000 plaintiff and her husband went to the Hartsdale Pet Cemetery and Crematory (the cemetery) for the purpose of discussing Dodo’s burial. On this date, plaintiff and a cemetery employee talked about various aspects of the burial process and options available. Among the topics discussed were the disposition of Dodo’s remains, the location and size of a burial plot, the style and cost of a casket and monument, and the available fees associated with the maintenance and upkeep of the plot and cemetery grounds. As a result of the discussion, plaintiff elected to have Dodo’s remains placed in an oak casket costing $495. Plaintiff selected the option of an individual burial at a cost of $190 and reserved a plot which was sufficient in size to also accommodate the eventual burial of plaintiffs second dog Bobo. The monument chosen was heart-shaped, pink in color, engraved with Chinese lettering and provided a space for *236 dual photographs of Dodo and Bobo. The cost of the monument was $783.[1]
On the same date, plaintiff received and signed a burial right certificate (the certificate). The front of the certificate provides in pertinent part as follows:
“This is to certify that the aforementioned individual has been granted to him/her and his/her heirs and devisees the exclusive use of the above stated plot as a burial place for deceased pet animals, under the terms, limitations and conditions declared and specified in a certain agreement dated May 14, 1914, and recorded in the office of the Register of the County of Westchester in Liber 2055 of Deeds, page 335; subject to the rules and regulations specifically enumerated on the reverse side of this Certificate.
Said rules and regulations are incorporated therein and made part and parcel of this Certificate with the same force and effect as if fully rewritten and incorporated herein.”
The reverse side of the certificate contains, in pertinent part, the following:
“Rules and Regulations of the Hartsdale Canine Cemetery:
“(1) This Burial Right Certificate grants the plot-holder the privilege of burying deceased pet animals in the Hartsdale Canine Cemetery in the designated location set forth in this document. The Burial Right Certificate is not a deed, but merely grants the holder a burial right subject to certain conditions, stipulations and limitations as set forth below.
“(2) All holders of burial rights are required to contribute his/her proportionate share toward the maintenance and general upkeep of the cemetery. This may be accomplished by assessing an annual charge payable in advance or by a single payment to the Perpetual Care Trust Fund.
“(3) In the event the annual charge on any lot remains unpaid for three years after such charge becomes due and payable, this corporation shall have the right to serve a notice by ordinary mail ad *237 dressed to the plot-holder of record at the address last known to this corporation. This notice will advise the holder that all rights, including the rights to any monuments affixed thereto, shall cease and terminate and will revert to this corporation if payment is not received within six months after the mailing of such notice. The Hartsdale Canine Cemetery, Incorporated is not responsible for any consequences resulting from the failure of mail to reach the plot-holder. . . .
“(9) This corporation may from time to time make such rules and regulations as its Board of Directors may deem requisite and proper to secure and promote the general objectives of the Cemetery.”
The agreement dated May 14, 1914, and made part of the certificate, provides, in relevant part, the following:
“And Whereas, the said Arthur S. Luria, Gustavus W. Rawson and Charles Bates Dana have constituted themselves a Committee to receive voluntary contributions from plot holders in the [Hartsdale Canine Cemetery, Inc.] and others, for the upkeep and improvement of the burial plots and of said cemetery as it now exists, and the owner thereof desires that the cemetery as it now exists shall receive the benefit of the efforts of such Committee and its successors as aforesaid ....
“THIRD. The Owner covenants and agrees that each and every of the present and future plot holders, whether such under licenses, burial permits, or burial rights, by whatever name called, which have heretofore been issued by said Samuel K. Johnson [President], or which have been or may be hereafter issued by the said Owner, its successors or assigns, shall have and hold the exclusive use of the plot or plots designated in such license or permit, or burial rights, by whatever name called, as a burial ground for canines or other deceased pet animals, which exclusive use the Owner hereby grants and confirms to such plot holders, his or her heirs or devisees, in perpetuity; upon the condition, however, that such plot holder, his or her heirs or devisees shall hold such plot or plots as and for such burial place and shall maintain thereon some monument, fence or railing or otherwise care for the same, so that such plot or plots shall be kept in good order and upon *238 the grounds be designated and identified as such burial place, and in case of failure so to do the said Owner shall have the right to serve a notice by mail addressed to said plot holder, his or her heirs or devisees last known to such Owner, at the address of either of such persons last known to it, and also to the Secretary and Treasurer of the heretofore mentioned Committee, last known to said Owner, at their address last known to it, stating that if he or she does not for six months after the mailing of such notice hold such plot or plots as and for a burial place and maintain thereon some monument, fence or railing, or otherwise care for the same so that such plot or plots shall be kept in good order and upon the grounds be designated and identified as such burial place, all the right, title and interest of such person in and to such plot and Cemetery in general under this agreement shall cease and determine and revert to said Owner, for the purpose of other burials ....
“SIXTH. The Owner covenants and agrees that it will not disturb nor consent to the disturbance of such plots nor any of them, nor will the said Owner disinter or permit any disinterment, without the consent in writing of the plot holder, except upon a reversion of such plot obtained in the manner hereinbefore provided in paragraph Third ....
“EIGHTH. The Owner covenants and agrees that this agreement shall form and be a part of all past, present and future licenses, permits or rights of burials, by whatever name called, whether issued by Samuel K. Johnson or the said Owner, its successors or assigns, the same as if incorporated therein at length, and each license, permit or burial right, by whatever name called, hereafter issued by the said Owner, its successors or assigns, shall refer to this agreement as a part thereof....
“ELEVENTH. This agreement shall be binding upon the Owner, its successors and assigns, and upon the said Committee and its successors in office, and the covenants shall run to all present and future holders of burial plots in said Cemetery, whether such under licenses, permits or burial rights, by whatever name called, which have heretofore been issued by Samuel K. Johnson, or which *239 may have been, or may be hereafter issued by said Owner, its successors or assigns.”
Consistent with paragraph 2 on the reverse side of the certificate, defendant’s employee provided plaintiff with the option of choosing either annual care or perpetual care for Dodo’s plot. Plaintiff elected annual care. An invoice was generated which included, among the various costs indicated above, a charge of $450 for the certificate and concomitant right to bury Dodo in the Cemetery, along with a charge of $31 for the annual care of Dodo’s resting place. The invoice was paid in full on January 5, 2000. Notably, the invoice indicates that plaintiff provided a residential address which was located in Middle Village, New York.
Thereafter, plaintiff visited Dodo’s plot biannually, leaving an apple and flowers in the summer and a pumpkin and flowers in the fall. Defendant continued to maintain Dodo’s plot and the cemetery grounds, which included, among other things, the remounting of Dodo’s picture which had apparently dislodged from the face of Dodo’s monument.
Defendant mailed invoices to plaintiff at her Middle Village, New York address in 2001, 2002, 2003 and 2004, each invoice requesting payment for the annual care of Dodo’s plot and cemetery grounds. No payments were received from plaintiff. More specifically, invoices which billed for both 2001 and 2002 annual care of Dodo’s plot were mailed to plaintiff. These invoices were never returned as undeliverable. The invoice which billed for 2003 annual care was mailed in late December 2002 and was returned as undeliverable. In late 2003 defendant sent a notice and final invoice by certified mail to plaintiff at her Middle Village, New York address advising of the outstanding charges for annual care covering the period 2001-2004 and warning that failure to pay the charges due would result in the disinterment of Dodo’s remains, removal of the monument and reversion of the plot to the cemetery. The total amount due for annual care, including the cost due for the upcoming year of 2004, was $145. The notice and invoice were returned to defendant with a post office indication of “attempted not known.” As a result, plaintiffs right to the burial plot was terminated in 2004. Dodo was exhumed and cremated — the ashes spread over the cemetery grounds.
Conclusions of Law
Article 35-C of the General Business Law regulates the conduct of pet cemeteries and pet crematoriums operating in *240 the State of New York. General Business Law § 750, entitled “Declaration of Policy,” provides as follows:
“The legislature hereby finds and declares that the relationships that humans develop with other members of the animal kingdom that are taken into our homes and kept as pets aré unique and special. These relationships can enrich our lives and increase our happiness. Even after the death of a pet, human attachment to the memory of the pet often remains very strong and many people feel the need to memorialize their love for their animal by burying their pet in a pet cemetery. Pet cemeteries, their managers and owners have a special responsibility to their customers who have entrusted their pets’ remains with them. These pet cemeteries have a duty to act in an ethical and lawful manner to prevent grieving pet owners from experiencing further any emotional pain or financial manipulation. Perpetrations of fraud against grieving pet owners are unconscionable.
“The legislature further finds and declares that the people of this state have a vital interest in the establishment, maintenance and preservation of pet cemeteries and pet crematoriums and the proper operation of the businesses and individuals which own and manage the same. This article is determined an exercise of the police powers of this state to protect the well-being of our citizens, to promote the public welfare, to promote the health of the public and to prevent pet cemeteries and pet crematoriums from falling into disrepair and dilapidation and becoming a burden on the community” (as added by L 1992, ch 526, § 1).
A contemporaneous legislative declaration or finding contained in a statute may best be defined as an interpretation placed upon the statute at the time of its passage and also the stated reasons for its enactment (Koch v Dyson, 85 AD2d 346, 380 [2d Dept 1982, concurring op]). The declaration of legislative intent enables an interpretation and application of the statute most favorable for its intended beneficiary (see e.g. Matter of Orange County Publs., Div. of Ottaway Newspapers v Council of City of Newburgh, 60 AD2d 409, 416 [2d Dept 1978]). In this case, it is evident from the legislative declaration that the enactment of article 35-C was intended to protect pet owners and, as such, this law will be interpreted most favorably in this case for its intended beneficiary, the plaintiff.
*241 Further support for the conclusion that article 35-C of the General Business Law was intended as consumer protection legislation can be gleaned from a review of the bill jacket (see generally County of Erie v City of Buffalo, 4 NY2d 96 [1958]; De Ville v Continental Assur. Co., 10 AD2d 386 [4th Dept 1960], affd 8 NY2d 1080 [1960] [the contents of a bill jacket are not conclusive, but they may aid in ascertaining the legislative intent]). Various portions of the memoranda in support make clear that it was the intent of the Legislature to establish a statewide regulatory process which would impose fiscal and operational standards upon a pet cemetery in order to protect the public. Apparently, the deceptive business practices of the Long Island Pet Cemetery in the early 1990s were the precipitating event which compelled legislative action. After accepting money from pet owners to have their deceased pets either buried or cremated, the Long Island Pet Cemetery instead illegally dumped deceased pets in mass graves. Some news articles contained in the bill jacket report that over 250,000 pets may have been illegally dumped.
Wide support was filed in connection with the enactment of article 35-C. Each of the following supported passage of the bill: Executive Chamber, Executive Deputy Secretary of State, New York State Association of Pet Cemeteries, American Society for the Prevention of Cruelty to Animals, State Consumer Protection Board, Bide-A-Wee Home Association, the Hartsdale Canine Cemetery, Inc. (defendant herein), and the New York State Veterinary Medical Society (Bill Jacket, L 1992, ch 526).
General Business Law § 750-q (2) (as added by L 1992, ch 526, § 1) provides as follows:
“In lieu of a permanent maintenance endowment fee, the operator of a pet cemetery and a pet owner may enter into a contract for care of the pet cemetery on an annual basis. The pet owner then shall be charged an annual maintenance fee which shall be paid in the manner described below. However, only one contract for annual maintenance shall be entered into per gravesite and shall state specifically the amount of the annual maintenance fee to be paid each year.”
General Business Law § 750-v (as added by L1992, ch 526, § 1) provides as follows: “All pet cemetery owners and operators shall have the following duties: ... (3) [t]o clearly inform customers of the option of paying maintenance fees for care of *242 pet graves, including costs and benefits for permanent care for pet graves and annual care for pet graves.”
It is plaintiffs contention that defendant has violated General Business Law § 750-q (2) and § 750-v by failing to clearly inform her of the option to choose either perpetual care or annual care of Dodo’s plot and the attendant costs/benefits each form of care offers. Before analyzing this issue, the court must first determine the nature of the parties’ agreement and whether same contains all the material terms necessary for an enforceable contract.
In evaluating whether the nature of a contract is predominantly for the rendition of services or for the sale of goods, a court must view the transaction in its entirety, in order to determine the main object sought to be accomplished (Perlmutter v Beth David Hosp., 308 NY 100 [1954]). In this case, the court concludes that the parties’ agreement was predominantly for the rendition of services, that is, the interment of Dodo and continuing maintenance of the cemetery, of which the purchase of a plot, headstone and casket were incidental and adjunct to the services performed (see e.g. Gibraltar Mgt. Co., Inc. v Grand Entrance Gates, Ltd., 46 AD3d 747 [2d Dept 2007] [contract was predominantly for the performance of labor and services related to the construction of an entrance way on real property and the fabrication/installation of electronically-operated gates was an incidental part]; compare AP Propane v Sperbeck, 157 AD2d 27 [3d Dept 1990] [contract to install gas tanks and related equipment which also contained an agreement to purchase liquid propane gas for a three-year period was a contract for the sale of goods]; Levin v Hoffman Fuel Co., 94 AD2d 640 [1st Dept 1983] [contract to supply heating oil on an automatic basis was essentially an agreement for the sale of goods, and service aspect of agreement was incidental]).
Having concluded that the parties’ agreement is for the performance of labor and services, it must next be determined whether the contract satisfies any applicable statute of frauds. By its terms, the contract cannot be completed within one year. As such, the contract must satisfy the requirements of General Obligations Law § 5-701 (see generally Cron v Hargro Fabrics, 91 NY2d 362 [1998]).
As a general rule, an agreement for services governed by General Obligations Law § 5-701 must contain expressly or by reasonable implication all the material terms of the agreement (Dorman v Cohen, 66 AD2d 411 [1st Dept 1979]) and price is a *243 material term of every contract for services (Tufano v Morris, 286 AD2d 531 [3d Dept 2001]; Cooper Sq. Realty v A.R.S. Mgt., 181 AD2d 551 [1st Dept 1992]; compare AP Propane v Sperbeck, 157 AD2d 27 [3d Dept 1990] [a contract for the sale of goods for the price of $500 or more must be in writing (UCC 2-201 [1]) and such a writing will be enforceable despite any deficiency in stating the price of the goods]). Defendant argues that the signed certificate and invoice(s), when considered together, constitute a contract which satisfies General Obligations Law § 5-701. The court agrees.
It is well settled that an integration of several documents satisfies the statute of frauds (General Obligations Law § 5-701 [a]) where the writings refer to the same subject matter, together contain all the material terms, and at least one is signed or prepared by the party to be charged (see Crabtree v Elizabeth Arden Sales Corp., 305 NY 48 [1953]; see e.g. American Linen Supply Co. v Penn Yan Mar. Mfg. Corp., 172 AD2d 1007 [4th Dept 1991] [original agreement signed by the party to be charged, sizing slips, invoices, check in payments of invoices and corroborating testimony of parties satisfied the statute of frauds]; see also Royal Air Maroc v Servair, Inc., 603 F Supp 836 [SD NY 1985]; compare Mauala v Milford Mgt. Corp., 559 F Supp 1000 [SD NY 1983] [court rejected argument that lease, checks and written notices satisfied the statute of frauds]). The fact that the documents were not prepared with the intention of evidencing a contract, or that the documents came into existence subsequent to its execution, is immaterial (see Lalonde v Modern Album & Finishing Co., 38 AD2d 960 [2d Dept 1972]).
In this case, the signed certificate and the January 5, 2000 invoice contain all the material terms of an enforceable contract. Both the signed certificate and invoice were delivered to plaintiff on the same day and refer to the same subject matter. The parties to the agreement are clearly identified, the relative rights and obligations of the parties are adequately set forth, and the cost of the items purchased and services to be provided is indicated in sufficient detail.
Alternatively, where an agreement fails to comply with General Obligations Law § 5-701 (a) the doctrine of part performance can nonetheless create an enforceable oral agreement where the parties’ part performance is unequivocally referable to that oral agreement (see Singh v Kur, 64 AD3d 697 [2d Dept 2009]; EDP Hosp. Computer Sys., Inc. v Bronx-Lebanon Hosp. Ctr., 63 AD3d 665 [2d Dept 2009]; Durante Bros. Constr. Corp. v *244 College Point Sports Assn., 207 AD2d 379 [2d Dept 1994]; Carey & Assoc. v Ernst, 27 AD3d 261 [1st Dept 2006]; Signature Brokerage v Group Health, 5 AD3d 196 [1st Dept 2004]; Travis v Fallani & Cohn, 292 AD2d 242 [1st Dept 2002]; Steele v Delverde S.R.L., 242 AD2d 414 [1st Dept 1997]; OnBank & Trust Co. v Burr Enters., 235 AD2d 799 [3d Dept 1997]; but compare Messner Vetere Berger McNamee Schmetterer Euro RSCG v Aegis Group, 93 NY2d 229, 235 n 1 [1999]; Stainless Broadcasting Co. v Clear Channel Broadcasting Licenses, L.P., 58 AD3d 1010 [3d Dept 2009]; Stephen Pevner, Inc. v Ensler, 309 AD2d 722 [1st Dept 2003]; Valentino v Davis, 270 AD2d 635 [3d Dept 2000]; Farash v Sykes Datatronics, 90 AD2d 965 [4th Dept 1982]).
The credible evidence shows that plaintiff selected and paid for various items and services associated with the interment of Dodo. Further, defendant undertook the necessary steps to bury Dodo and maintain the subject plot. To the extent that part performance can be considered in the context of this dispute, the parties evinced an intent to be bound and their conduct was unequivocally referable to an oral agreement, which therefore is not barred by the statute of frauds (see e.g Travis).
Pivotal to the outcome of this matter is whether defendant complied with the statutory requirement that plaintiff be clearly informed of the option to choose either perpetual care or annual care for Dodo’s plot and whether plaintiff was specifically advised of the attendant costs/benefits each form of care offers (General Business Law § 750-q [2]; § 750-v). Plaintiff and her husband both testified that they were never advised, either orally or in writing, of the option to choose either perpetual or annual care. Similarly, plaintiff testified that defendant never indicated that choosing annual care for Dodo’s plot would require yearly payment for the service.
It is well settled that a person who signs a contract is presumed to know its contents and to assent to the terms therein (Golden Stone Trading, Inc. v Wayne Electro Sys., Inc., 67 AD3d 731 [2d Dept 2009]; British W. Indies Guar. Trust Co. v Banque Internationale A Luxembourg, 172 AD2d 234 [1st Dept 1991]). In this case, plaintiff executed the certificate on January 5, 2000. As indicated above, paragraph 2 of the certificate unequivocally states that “[a] 11 holders of burial rights are required to contribute his/her proportionate share toward the maintenance and general upkeep of the cemetery. This may be accomplished by assessing an annual charge payable in advance *245 or by a single payment to the Perpetual Care Trust Fund.” The plain language of this paragraph comports with the statutory requirement that a pet owner be informed of their option to choose either perpetual care or annual care. Further, the January 5, 2000 invoice, which was paid in full by plaintiff on that same date, contains a line item for “annual general care” with a corresponding charge of $31. This proof evinces that plaintiff was well aware of the cost for the care that she selected.
In addition, over the repeated objection of plaintiffs counsel, the court allowed defendant’s principal to testify regarding defendant’s practice of advising all prospective customers of the care options, benefits and costs associated with the burial of a pet. It was counsel’s contention that defendant’s principal lacked personal knowledge of the events which occurred and thus was unable to offer relevant and admissible proof.
In New York, proof of a business, professional or other institutional practice or custom is admissible to show that the practice or custom was or would have been followed under the same set of circumstances on a specific occasion (Soltis v State of New York, 188 AD2d 201 [3d Dept 1993]). In other words, evidence of a routine practice is admissible as circumstantial evidence that an individual acted in conformity with his routine practice on the date in question (Rigie v Goldman, 148 AD2d 23 [2d Dept 1989]). As recognized by the Court of Appeals, “[circumstantial proof is, of course, as probative as direct evidence and may be even more persuasive” (New York State Assn. of Counties v Axelrod, 78 NY2d 158, 171 [1991], citing 1A Wigmore, Evidence § 26, at 957, 961 [Tillers rev 1983]). Further, the admissibility of business, professional or other institutional custom or practice is not limited to instances where the witness is to testify solely to a personal habit or custom and was in total control of the circumstances. Rather, an employee may testify to the custom and practice of his organization as probative evidence of the conduct of other employees of the organization on a given occasion (Soltis v State).
Defendant’s principal testified that it was customary for all pet owners to receive a price list and other information regarding the comparative costs and benefits of perpetual care and annual care. Although defendant’s principal was unable to testify with conviction that he actually spoke to either plaintiff or her husband, his testimony was nonetheless credible and probative on the issue raised. Notably, this witness has been defendant’s president for 35 years and was possessed of sufficient knowl *246 edge and experience to testify as to defendant’s business practices.
Plaintiff asserts that by simply maintaining a monument on Dodo’s plot defendant had no right to terminate the parties’ contract, exhume Dodo and cremate his remains. This contention finds some support in paragraph THIRD of the agreement dated May 14, 1914 which grants a plot holder exclusive use of the plot in perpetuity upon the condition that the plot holder “shall maintain thereon some monument, fence or railing or otherwise care for same, so that such plot . . . shall be kept in good order.” However, paragraph 9 of the certificate permits defendant to make “such rules and regulations as its Board of Directors may deem requisite and proper to secure and promote the general objectives of the Cemetery.” The court finds that the rule established in paragraph 2 of the certificate which requires a plot holder to “contribute his/her proportionate share towards the maintenance and general upkeep of the Cemetery” is required for the proper maintenance of defendant’s business and therefore promotes the general objectives of the cemetery. Reading the paragraphs in the agreement and certificate together, plaintiffs argument that the mere presence of a monument on the plot prevented defendant from terminating the parties’ contract is unpersuasive.
Plaintiff also argues that the phrase “annual general care” does not, standing alone, mean that plaintiff was required to tender a yearly payment for the maintenance of Dodo’s plot and upkeep of the cemetery. Apparently, it is plaintiffs contention that she was only required to make one payment of $31 under the January 5, 2000 invoice and receive, in return, care of Dodo’s plot in perpetuity. Defendant contends that the language “annual general care” is plain and that plaintiff understood it to mean the obligation of yearly payments.
The threshold decision on whether a contract term is ambiguous is within the exclusive province of the court (Sutton v East Riv. Sav. Bank, 55 NY2d 550, 554 [1982]). Once the court makes its threshold determination that a contract term is ambiguous, the construction of the ambiguous term is an issue to be resolved by the factfinder, with the parties’ intent at the time of contracting ascertained either from within the four corners of the document, if possible, or, as a last resort, by passing on the credibility of extrinsic evidence and whatever reasonable inferences can be drawn therefrom (id,.; see also Bjerke v Bjerke, 69 AD3d 1042 [3d Dept 2010]; 333 E. 43 Owners Corp. v Boylan, *247 22 Misc 3d. 135[A], 2009 NY Slip Op 50283[U] [App Term, 1st Dept 2009]).
Where a contract fails to define terminology susceptible to varying reasonable interpretations, resulting ambiguities must be construed against the drafter and in favor of the party who had no voice in the selection of its language (Guardian Life Ins. Co. of Am. v Schaefer, 70 NY2d 888 [1987]; 67 Wall St. Co. v Franklin Natl. Bank, 37 NY2d 245 [1975]). Notwithstanding this rule of law, it is nonetheless true that where a particular interpretation would lead to an absurd result, the court can reject such a construction in favor of one which would better accord with the reasonable expectations of the parties (Reape v New York News, 122 AD2d 29 [2d Dept 1986]; William A. White/Tishman E. v Banko, 171 AD2d 401 [1st Dept 1991]; Samuels v Thomas Crimmins Contr. Co., 1993 WL 36168, 1993 US Dist LEXIS 1336 [SD NY 1993]). In fact, “[t]here is a canon of construction which cogently argues that a rationale, sensible and practical construction of a . . . contract should be preferred to one which is unreasonable, absurd or impracticable” (Public Serv. Commn., Second Dist. v New York Cent. R.R. Co., 193 App Div 615, 618 [3d Dept 1920]). Last, while ambiguities in a contract are generally to be resolved against the drafter of the contract, the terms of a contract are nevertheless to be construed reasonably (Emery v Fishmarket Inn of Granite Springs, 173 AD2d 765 [2d Dept 1991]).
Nowhere does the documentary evidence define the term “annual.” Black’s Law Dictionary 89 (6th ed) defines “annual” as follows: “Of or pertaining to year; returning every year; coming or happening yearly. Occurring or recurring once in each year; continuing for the period of a year; accruing within the space of a year; relating to or covering the events or affairs of a year.” Based upon the foregoing definition, the term “annual” is susceptible to varying reasonable interpretations. The term “annual” arguably could pertain to a single year or refer to an event or obligation that occurs yearly. Thus, the term “annual” is ambiguous and the court will consider the credible extrinsic evidence of the parties’ intent at the time of contracting and whatever reasonable inferences can be drawn therefrom.
It is evident from the credible testimony that plaintiff understood the term “annual” to require a payment each year for the general maintenance of the plot and cemetery. In fact, on cross-examination, plaintiff readily admits that the word “annual” means “every year.” Moreover, adopting plaintiffs in *248 terpretation of the term “annual” would lead to the absurd result of a one-time payment of $31 covering the cost of general maintenance of the burial plot and cemetery’s common grounds in perpetuity. Accordingly, the court concludes that a single payment of $31 for the care of Dodo’s plot and the cemetery grounds in perpetuity was not an intended result of the parties’ agreement. Indeed, this conclusion is manifestly equitable to both parties and avoids giving plaintiff an unfair and unreasonable advantage over defendant, that is, perpetual care of Dodo’s plot and the cemetery grounds for a mere single and nominal payment of $31 (Heller v Kalisch, 141 App Div 205 [1st Dept 1910] [court will endeavor to give the construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other]).
While plaintiff contends that she moved to New Jersey in April 2002 and that the cemetery was advised of a change in her address sometime in October 2001, the evidence on this point is unpersuasive. More specifically, plaintiff was unable to identify an individual in defendant’s employ who actually received the alleged change of address and whether it was plaintiffs husband or a cemetery employee who wrote down the change of address information on a “post-it note.” In addition, although defendant’s testimony established the business practice of utilizing an “address change authorization form,” no such document was ever completed by plaintiff.
It is also noteworthy that paragraph 3 of the certificate states as follows: “The Hartsdale Canine Cemetery, Incorporated is not responsible for any consequences resulting from the failure of mail to reach the plot-holder.” With respect to this type of disclaimer, the law generally enforces contractual provisions absolving a party from its own negligence. Conversely, public policy forbids a party from contractually shielding itself from damages occasioned by grossly negligent conduct (see Colnaghi, U.S.A. v Jewelers Protection Servs., 81 NY2d 821 [1993]). There is no evidence in this case to suggest that defendant was either negligent or grossly negligent with respect to the record keeping of plaintiffs address and the mailing of invoices or notices to plaintiff. As such, the disclaimer of responsibility for mail which did not reach plaintiff is an enforceable provision of the contract.
Furthermore, both the documentary evidence and testimony regarding defendant’s standard office procedure establish a presumption that plaintiff received the subject invoices mailed *249 in 2001 and 2002 (see generally Matter of Ford v Dowling, 213 AD2d 402 [2d Dept 1995]; City of Yonkers v Clark & Son, 159 AD2d 535 [2d Dept 1990]; Dilon Med. Supply Corp. v Progressive Cas. Ins. Co., 12 Misc 3d 127[A], 2006 NY Slip Op 50908[U] [App Term, 2d & 11th Jud Dists 2006]). Plaintiff has failed to offer credible evidence which rebuts the presumption of delivery.
Accordingly, the court concludes that plaintiff has failed to establish her case against the defendant by a preponderance of the evidence (see Naclerio v Adjunct Faculty Assn., 1 Misc 3d 135[A], 2003 NY Slip Op 51644[U] [App Term, 9th & 10th Jud Dists 2003] [even in the relatively relaxed and informal atmosphere of the small claims forum, plaintiff still bears the burden of establishing her case by a preponderance of the evidence]). Plaintiff received all the protections afforded under General Business Law § 750-q (2) and § 750-v. She breached her agreement to pay an annual fee each year for the care and upkeep of Dodo’s resting place. Defendant mailed out the requisite notice to plaintiff and upon plaintiff’s failure to respond, the plot properly reverted back to defendant. Plaintiffs case is therefore dismissed.[2]
In contrast, defendant has established by a preponderance of the evidence the existence of an enforceable agreement to pay a yearly charge for the annual care of Dodo’s plot and plaintiffs breach thereof. Judgment awarded on defendant’s counterclaim in the sum of $145, this amount representing unpaid fees for annual care between 2001 and 2004.

. Plaintiffs affection for Dodo and her commitment to spend money for the care and well-being of her dog was further shown by proof that in the past she had expended $10,000 for the surgical implant of a pacemaker inside Dodo.

. At the close of plaintiffs case, defendant’s CPLR 4401 motion for judgment dismissing the case as against defendant Edward C. Martin was granted based upon insufficient evidence of personal liability.